24CA0399 West Cornell v Kidwell 02-13-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 24CA0399
Arapahoe County District Court No. 22CV31929
Honorable Ben L. Leutwyler III, Judge

---

West Cornell Holdings, LLC,

Plaintiff-Appellee,

v.

Jay Kidwell,

Defendant-Appellant.

---

JUDGMENT AFFIRMED AND CASE
REMANDED WITH DIRECTIONS

Division VI
Opinion by JUDGE SCHUTZ
Welling and Kuhn, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced February 13, 2025

---

Murr Siler Eckels Delaney, PC, Joseph A. Murr, Daniel J. Hamilton, Denver, Colorado, for Plaintiff-Appellee

Fairfield and Woods, P.C., Lee Katherine Goldstein, Denver, Colorado, for Defendant-Appellant

¶ 1     Defendant, Jay Kidwell, appeals the district court's entry of summary judgment against him on a breach of contract claim brought by plaintiff, West Cornell Holdings, LLC (West Cornell), and the district court's awards of specific performance and attorney fees to West Cornell.  We affirm the judgment and awards and remand with directions for the district court to determine appellate fees and costs.

¶ 2     Background

¶ 3     Kidwell owned a commercial building in Colorado.  Cyrus Pourjavaheri contracted with Kidwell to purchase the property.  When the parties negotiated and executed the contract, they were unrepresented by counsel.  The contract was prepared by a transaction broker using the form contract approved by the Colorado Real Estate Commission (CREC) for commercial real estate purchases.

¶ 4     The contract called for a purchase price of $1.625 million with a down payment of $325,000.  The contract also contained a seller-finance provision, which required Kidwell to loan $1.3 million to be credited toward the purchase price.  The loan was to be evidenced by a note signed by Pourjavaheri and secured by a deed of trust on

1

the property.  The contract also required Pourjavaheri to enter into a lease agreement with the existing tenant in the building.

¶ 5     The parties included an additional provision, section 29.1, not provided for in the CREC form contract, which granted Pourjavaheri the right to assign his interest therein:

> [Pourjavaheri] may assign this Contract to an entity which is "affiliated" with [Pourjavaheri] without obtaining [Kidwell's] prior written consent, provided that [Pourjavaheri] gives [Kidwell] written notice of such assignment and any such assignee expressly assumes the obligations and liabilities of [Pourjavaheri] under this Contract.  For purposes hereof, an entity shall be deemed to be 'affiliated' with [Pourjavaheri] if [Pourjavaheri] (or any principal or constituent owner of [Pourjavaheri]) shall, directly or indirectly through one or more intermediaries, control such entity or own any portion of the stock, membership or partnership units of such entity.

¶ 6     The parties set the initial closing date for September 2022. Two days before the September closing date, Kidwell was informed that Pourjavaheri intended to assign his rights under the contract to a newly formed Texas limited liability company, West Cornell, which was solely owned by Pourjavaheri.  Kidwell objected to the

2

assignment and requested an extension of the closing date. Pourjavaheri declined to grant the request.

¶ 7     Ultimately, Pourjavaheri did not assign his rights in the contract to West Cornell before the September closing. There is some dispute about whether Kidwell was aware of Pourjavaheri's decision not to do so.

¶ 8     At the appointed date and time for closing, Pourjavaheri appeared with the necessary funds to consummate the purchase. Kidwell did not appear and did not execute closing documents at any point.

¶ 9     Shortly after the September closing date, Pourjavaheri executed the contemplated assignment of his rights under the contract, and he and West Cornell signed an assumption agreement. West Cornell then retained counsel and filed the underlying suit. After subsequent discussions, the parties set a second closing date in November 2022.

¶ 10    The parties negotiated several new documents before the November date, including a contemplated lease agreement with the building's current tenant. Pourjavaheri also agreed to sign the note personally, as a borrower, in addition to West Cornell. Four days

before closing, Kidwell's attorney sent all required closing documents to the title company. On the morning of the November closing, Kidwell's attorney sent another document to West Cornell's attorney, which included proposed changes to the lease agreement. The parties' attorneys exchanged several emails throughout the day regarding Kidwell's proposed changes, which Pourjavaheri ultimately rejected.

¶ 11 Pourjavaheri once again appeared at the November closing to execute the necessary documents and deliver the unfinanced portion of the purchase price. Once again, Kidwell did not appear and did not execute any closing documents.

¶ 12 West Cornell's complaint contained a single claim for breach of contract alleging that Kidwell failed to complete the September closing. West Cornell's motion for summary judgment argued that there were no disputed facts, and the undisputed facts established that Kidwell had breached the contract when he failed to appear for both the September and November closings.

¶ 13 The district court granted West Cornell's motion for summary judgment and ordered specific performance of the contract. Kidwell appeals the judgment, claiming that he was never in breach, and

even if he was, specific performance was an inappropriate remedy. West Cornell argues that it never breached and that Kidwell's failure to close was a breach of the contract, and therefore the district court correctly entered judgment in its favor.

## I. Analysis

### A. Kidwell's Breaches of Contract

¶ 14 West Cornell argues that Kidwell breached the contract by failing to close. Kidwell argues that his failure to close was excused because Pourjavaheri had already breached by assigning his rights under the contract to West Cornell. We conclude the district court correctly determined that Kidwell was the breaching party.

#### 1. Standard of Review

¶ 15 Contract interpretation presents a question of law that we review de novo. *Sch. Dist. No. 1 v. Denver Classroom Tchrs. Ass'n*, 2019 CO 5, ¶ 11. "In reviewing a breach of contract case, we defer to the trial court's findings of fact if the record supports them, and we review its conclusions of law de novo." *Albright v. McDermond*, 14 P.3d 318, 322 (Colo. 2000). Specifically, "[i]n determining whether certain provisions of a contract are ambiguous, we focus on the words employed and construe any undefined words 'in

harmony with the[ir] plain and generally accepted meaning.'" *Sch. Dist. No. 1*, ¶ 13 (quoting *Cheyenne Mountain Sch. Dist. No. 12 v. Thompson*, 861 P.2d 711, 715 (Colo. 1993)). "If the contract is complete and free from ambiguity, we deem it to represent the parties' intent and enforce it based on the plain and generally accepted meaning of the words used." *Id.* at ¶ 14.

¶ 16    "Generally, absent an express provision to the contrary, executory contracts are assignable unless they involve a matter of personal trust or confidence or are for personal services." *Scott v. Fox Bros. Enters., Inc.*, 667 P.2d 773, 774 (Colo. App. 1983) (citing *Matson v. White*, 220 P.2d 864 (Colo. 1950)). Every contract contains an implied obligation of good faith and fair dealing. *Univ. of Denver v. Doe*, 2024 CO 27, ¶ 51. The implied obligation may be relied upon when a contract term grants either party discretion in its performance. *Id.* The implied good faith provision may not, however, be relied upon to contradict any terms or conditions for which another party has bargained. *Id.* Whether a party has acted in good faith presents an issue of fact that we review de novo. *Id.*

## 2. September Closing

¶ 17    Kidwell contends that he did not breach the contract by failing to close in September because Pourjavaheri breached the contract by notifying Kidwell that he planned to assign his contractual rights to West Cornell after the expiration of the deadline for objecting to financing conditions. Because West Cornell breached the contract, the argument continues, Kidwell was excused from closing in September. Kidwell does not specifically reference the implied obligation of good faith and fair dealing in his briefs. But it appears he is relying upon the principles of that doctrine because he attempts to portray Pourjavaheri's assignment as a breach because its timing "unreasonably" deprived him of the right to object to the assignment within the financing conditions objection deadline.

¶ 18    West Cornell contends that neither it nor Pourjavaheri breached the contract before either the September or November closing dates. Indeed, West Cornell notes that the contract expressly granted Pourjavaheri the right to assign his interests without Kidwell's consent and without any restriction on when that right could be exercised.

¶ 19   We reject Kidwell's argument because, as West Cornell argues, section 29.1 expressly gave Pourjavaheri the right to assign the contract to an affiliated entity without Kidwell's consent.  In addition, section 29.1 placed no restriction on when Pourjavaheri could exercise his assignment right.  Thus, we perceive no bad faith in Pourjavaheri's exercise of his contractual rights.  Given the law's favorable view of the assignability of contracts, *Scott*, 667 P.2d at 774, and the broad rights granted Pourjavaheri under section 29.1, we perceive no "unreasonable" or bad faith actions that run afoul of the contract's express terms or the implied obligation of good faith and fair dealing.  *See Univ. of Denver*, ¶ 51.

¶ 20   As previously stated, there is some ambiguity about whether Kidwell knew that Pourjavaheri had refrained from assigning the contract to West Cornell before the September closing.  However, ultimately, whether Kidwell knew that Pourjavaheri had not completed the assignment is immaterial because Pourjavaheri had bargained for the broad right to assign his rights and therefore there was no breach regardless of whether Pourjavaheri ultimately completed the assignment.

¶ 21    When presented with clear language, we interpret the contract according to its terms. *Sch. Dist. No. 1*, ¶¶ 13-14. Based on the plain language of section 29.1, we conclude that Pourjavaheri was permitted to assign his rights to an entity that he was "affiliated with," which included West Cornell because Pourjavaheri was the sole owner and member of it.

¶ 22    Because Pourjavaheri was within his rights under the contract to assign his interest to West Cornell, even if he had completed the assignment prior to the September closing, he would not have been in breach. Therefore, regardless of whether Kidwell knew Pourjavaheri had not completed the assignment, Pourjavaheri did not breach the contract.

¶ 23    Thus, Kidwell's argument that he was excused from performing because Pourjavaheri first breached the contract fails. It necessarily follows that Kidwell is the breaching party because of his failure to appear or otherwise execute the necessary contract documents prior to the September closing. Thus, the district court did not err by entering summary judgment in West Cornel's favor based on Kidwell's breach.

### 3. November Closing

¶ 24 At the November closing date, Pourjavaheri again appeared and was prepared to close. Kidwell once again did not appear for closing, execute any closing documents, or make any material objections prior to closing. He again offers various arguments in an effort to excuse his nonappearance. But we need not address these arguments further because Kidwell's failure to attend the September closing, standing alone, justified the entry of summary judgment against him.

### B. Specific Performance

¶ 25 Kidwell argues that even if he did breach the contract, the district court erred by granting the remedy of specific performance. He contends that the contract to purchase and the related seller-financing relationship created the equivalent of a personal services contract that did not lend itself to specific performance. We are not persuaded.

### 1. Standard of Review and Applicable Law

¶ 26 "Specific performance is a remedy developed by courts of equity to provide relief when the legal remedies of damages and restitution are inadequate." *Air Sols., Inc. v. Spivey*, 2023 COA 14,

10

¶ 48 (quoting 12 Joseph M. Perillo, *Corbin on Contracts* § 63.1, at 215 (rev. ed. 2012)). Whether specific performance is an appropriate remedy depends on the unique circumstances of each case. "We therefore review a trial court's decision whether to order specific performance for an abuse of discretion. A court abuses its discretion when its decision is manifestly arbitrary, unreasonable, or unfair, or based on a misapprehension or misapplication of the law." *Id.* at ¶ 50.

¶ 27    Personal services contracts typically involve "personal skill, trust, or confidence." *Matson*, 220 P.2d at 866 (citation omitted); *see also Scott*, 667 P.2d at 774. They are often contracts with terms that "require protracted supervision and direction, with the exercise of special knowledge, skill, or judgment in such oversight." *Antero & Lost Park Reservoir Co. v. Lowe*, 194 P. 945, 955-56 (Colo. 1920). Personal services contracts can also include "[c]ontracts for personal care and attention or personal services." *Oles v. Wilson*, 141 P. 489, 495 (Colo. 1914) (quoting *Oswald v. Nehls*, 84 N.E. 619, 622 (Ill. 1908)). Personal services contracts "are not, as a rule, specifically enforced." *Antero*, 194 P. at 956.

¶ 28    The supreme court has characterized various other agreements as personal services contracts, but none of these cases lend credence to Kidwell's argument that this contract or the related seller-finance obligations were tantamount to a personal services contract that could not be specifically enforced. *See In re Estate of Haywood*, 599 P.2d 976, 979 (Colo. App. 1979) (holding that a personal services contract existed between a niece and her aunt when the niece maintained the house and cared for her aunt's physical and emotional needs with the expectation of an inheritance; in such circumstance specific performance could be an appropriate remedy for aunt's breach); *Albert-Ross Refrigerator & Fixture Co. v. Pastore*, 111 P.2d 231, 231-32 (Colo. 1941) (determining that a business agreeing to pay overtime to a highly skilled employee constituted a personal services contract and that type of contract could be specifically enforced).

## 2.    Analysis

¶ 29    Kidwell argues that the district court erred by finding that the contract and seller-financing provisions did not amount to a personal services contract, particularly given the hostility between

the parties. But the cases Kidwell relies on are all materially different from this one.

¶ 30     *Oles* involved the adoption (via contract) of a seven-year-old girl and allegations that the adoptive father did not sufficiently perform his end of the contract because he did not leave the child one-third of his estate. 141 P. at 490-91. The adopted daughter sued the executor of the adoptive father's estate for specific performance to transfer her one-third of father's estate. *Id.* at 491. The supreme court acknowledged that adoptive daughter's services were personal in nature but nonetheless granted her the remedy of specific performance. *Id.* at 498. Thus, the rationale of *Oles* actually works against Kidwell's argument that specific performance was improper here.

¶ 31     Moreover, personal services contracts, like the one in *Oles*, are highly specific and individual in nature. Kidwell's seller-financing obligation, on the other hand, was neither highly personal nor specific — it was merely a commercial loan, a transaction that occurs routinely in the marketplace. True, seller financing is not as common as third-party financing. But the ongoing financial relationship is not personal in nature or subjective. While it may

require de minimis ongoing contacts, they are governed by objective standards. We don't perceive how performance of these contractual obligations could be materially colored by personal animosity or the exercise of subjective judgment.

¶ 32 Likewise, Kidwell's reliance on *Antero* is also misplaced. *Antero* involved the construction of a canal, the performance of which was subject to plans and standards that required ongoing supervision and the exercise of judgment. 194 P. at 956. In rejecting the plaintiff's request for specific performance, the court noted that the remedy was not appropriate because the contract required "protracted supervision and direction, with the exercise of special knowledge, skill, or judgment in such oversight." *Id.* at 955-56. These subjective performance standards counseled against a remedy of specific performance. *Id.* In contrast, the seller-finance provisions required no such special knowledge, skill, or subjective exercise of judgment. Thus, *Antero* does not support Kidwell's arguments.

¶ 33 This case is also materially different from *Air Solutions*, which Kidwell leans on in support of his argument that the district court did not adequately consider the animosity between Pourjavaheri

14

and him. In *Air Solutions*, two people contracted to form a closely held company which in turn would purchase an existing closely held company. The relationship deteriorated rapidly, and one party sued seeking specific performance for an agreement to convey an interest in the nascent company. *Air Sols.*, ¶ 1. The district court denied specific performance. *Id.* at ¶ 92. On appeal, the majority of the division concluded that the trial court had abused its discretion by denying specific performance because damages were not an adequate remedy in the case and the contract was sufficiently specific to allow for specific performance, notwithstanding the ongoing animosity between the parties. *Id.* at ¶ 87.

¶ 34     Kidwell points to the partial dissent in *Air Solutions*, which reasoned that specific performance was not appropriate because it would compel joint ownership of a closely held company — with the attendant ongoing fiduciary relationship requiring extensive subjective decisions — between two parties who did not trust each other. *Id.* at ¶ 158 (Schutz, J., concurring in part and dissenting in part). In contrast, the contemplated relationship between Kidwell and West Cornell is a purely commercial one and would not require

15

the parties to be heavily involved with joint decision-making or applying subjective standards or judgment.

¶ 35    In sum, Kidwell points to no authority or issues of disputed fact that would support his contention that the seller-financing obligation was a personal services contract. Accordingly, the district court did not abuse its discretion or misapply the law by ordering specific performance.

## C.    Fees and Costs

¶ 36    In the event of litigation over its enforcement, the contract required the court to "award to the prevailing party all reasonable costs and expenses, including attorney fees." The district court awarded fees and costs to West Cornell on the grounds that it was the prevailing party.

¶ 37    Kidwell argues that the district court's award of fees and costs should be reversed if we reverse the district court's order for summary judgment. However, we affirm the district court's summary judgment order; therefore, we affirm the district court's award of fees and costs to West Cornell.

¶ 38    West Cornell is also the prevailing party on appeal and therefore is entitled to an award of fees and costs incurred on

appeal. Because the district court is uniquely suited to undertake the factfinding necessary to determine such an award, we exercise our discretion and remand to the district court to determine and award West Cornell its reasonable appellate attorney fees under C.A.R. 39.1 and C.A.R. 39(c)(1).

## II. Disposition

¶ 39 The district court's summary judgment, specific performance, and attorney fee orders are affirmed, and we remand to the district court with directions.

JUDGE WELLING and JUDGE KUHN concur.